[Cite as *State v. Newton*, 2018-Ohio-1392.]

# Court of Appeals of Ohio

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

---

### JOURNAL ENTRY AND OPINION
### No. 105771

---

## STATE OF OHIO

PLAINTIFF-APPELLANT

vs.

## MARK A. NEWTON

DEFENDANT-APPELLEE

---

## JUDGMENT:
AFFIRMED

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-16-608062-A

**BEFORE:** E.A. Gallagher, A.J., McCormack, J., and Celebrezze, J.

**RELEASED AND JOURNALIZED:** April 12, 2018

**ATTORNEYS FOR APPELLANT**

Michael C. O'Malley
Cuyahoga County Prosecutor
BY: Margaret Kane
Mary M. Frey
Assistant Prosecuting Attorneys
The Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113


**ATTORNEYS FOR APPELLEE**

Paul B. Daiker
Adam Brown
Larry W. Zukerman
Zukerman, Daiker & Lear Co., L.P.A.
3912 Prospect Avenue
Cleveland, Ohio 44115

EILEEN A. GALLAGHER, A.J.:

{¶1} Plaintiff-appellant the state of Ohio ("State") has appealed from the Cuyahoga County Common Pleas Court's judgment dismissing the case against defendant-appellee, Mark Newton. We affirm.

**Introduction**

{¶2} On September 12, 2016, Newton was indicted for two counts of rape, two counts of gross sexual imposition, two counts of kidnapping and two counts of sexual battery. The case proceeded to a bench trial and during the testimony of the alleged victim, J.E., it was revealed that the investigating detective assigned to the case, Jessica Page, had lost or destroyed a relevant diagram drawn by J.E. during a recorded interview. Upon examination, Page lied in an attempt to conceal her role in the matter. After the testimony of J.E., Page and a second detective involved in the case concluded, the trial court granted a motion to dismiss the case that was made by the defense.

{¶3} Our review here is limited to the issue as to whether the trial court erred in granting Newton's motion to dismiss and dismissing the case with prejudice.

**Facts and Procedural History**

{¶4} In 2015, J.E. alleged that Newton sexually assaulted her twice in 2013 in an equipment room at Laurel School in Shaker Heights, Ohio during the spring of her eighth grade year. J.E. described the alleged incidents at trial as follows: J.E. was a pitcher on a school softball team coached by Newton. During the second half of April, 2013 the team was practicing indoors in the "big gym" at Laurel. Newton approached J.E. and asked

her to accompany him, alone, to a separate, smaller gym in the school for pitching practice. Newton and J.E. left the big gym and stopped at the "equipment room" located in a hallway between the two gyms. Newton opened the door to the equipment room and J.E. entered for the purpose of retrieving a bucket of balls located inside to be used for pitching practice. After J.E. entered, Newton closed the door behind them, approached J.E. and ran his hands underneath J.E.'s shorts and underwear, rubbing her vagina. When the incident ended, Newton apologized and J.E. exited the room and returned to practice in the big gym with her teammates. She did not tell anyone about what had happened. J.E. testified that she had accompanied Newton alone to pitching practice in the small gym several times during the next two weeks and nothing untoward had occurred at those times. J.E. further testified that approximately two weeks after the first incident in May 2013, a second incident occurred in a virtually identical fashion.

{¶5} Detective Jessica Page of the Shaker Heights Police Department was assigned to the case and conducted a recorded interview with J.E. on March 23, 2015, during which J.E. described the equipment room, later identified as room G0003, as containing shelves, bats, helmets and soccer balls. Later in the interview, J.E. noted that the room was an art room for a period of time while the school was being renovated. J.E. drew a diagram of the school that set forth the relevant rooms including the equipment room. Page took the diagram and entered it into their file.

**{¶6}** Detective Page admitted at trial that she described herself as J.E.'s "advocate" and made a number of statements during the first interview that the state concedes were inappropriate:

1) She described J.E.'s suggestion that Newton should be killed as an "appropriate response";

2) I'll do whatever my victim wants me to do;

3) I like sending people to prison though, don't get me wrong. So I will be here and I'll walk with you through the whole thing and I'll fight as hard as I can and I'll get as much evidence as I can * * * and I'll try and find everything I can find to help you;

4) You are not a bad witness;

5) You're putting the truth about what happened to yourself out there.

6) "Once someone is accused of being a sexual impositionist or someone who touches you know young ladies and takes advantage of their trust theres (sic) no going back from that whether you're convicted or not." Referencing Michael Jackson, Page stated, "the first thing that's gonna come up when you google his name is Mark Newton tried as [an] essentially rapist."

**{¶7}** After reviewing the recording of the first interview, Detective Page noticed that J.E. whispered something into her sleeve during a brief period when Page was out of the room. Page asked another Shaker Heights detective, Detective Walter Siegel, to review the video of the interview. Detective Siegel testified at trial that he listened to the relevant segment repeatedly and believed that J.E. whispered "I don't think she has the room right" in reference to the diagram created during the first interview. Based on this discrepancy, Detectives Page and Siegel conducted a joint interview with J.E. on April 21, 2016.

{¶8} During the second interview, J.E. denied making such a statement and the detectives questioned J.E. about her description of the equipment room. J.E. drew a second diagram featuring only the equipment room and circled the locations inside the room where the softballs were stored. It is impossible to discern from the video of the second interview where on the diagram J.E. placed the buckets of softballs. J.E. also described the room as musty, smelling of dust and containing catcher's equipment. J.E. contradicted this description at trial, testifying that the catcher's equipment had been in the room during a previous year and was not present at the time of the incidents.

{¶9} After the video of the second interview was played during the cross-examination of J.E., the trial court held a sidebar to address the second diagram. J.E. was excused from the courtroom and it was established that, prior to trial, Newton's counsel had requested that the state turn over the second diagram in discovery. The prosecutor explained that she had been informed by Detectives Page and Siegel that there was no second diagram.

{¶10} To address this discrepancy, the trial court allowed the parties to examine Detective Page. Page admitted that J.E. drew a second diagram during her second recorded interview and that she did not turn the diagram over to the prosecutor or Newton's counsel. Page testified that she did not know where the second diagram was, that she did not destroy it and that she did not think she had lost it but it might have been "shredded."

{¶11} Page was examined extensively about why the lost diagram had not been brought to the attention of the prosecutor or defense prior to trial. Page initially lied to the trial court, stating that she informed the prosecutor the week before trial that she believed there was a second diagram but that she could not find it. Upon further examination, however, Page admitted that she did not tell the prosecutor about the second diagram. According to Page, she did not remember the second diagram being created until the prosecutor contacted her about the defense's discovery request. At that point she informed the prosecutor and Detective Siegel that there was no second diagram. She subsequently reviewed the video from J.E.'s second interview and learned that a second diagram had been created. After she was unable to locate the diagram in her case file or desk, she chose not to inform Detective Siegel or the prosecutor of its existence prior to trial.

{¶12} Page admitted that she knew that the diagram contained information that could potentially be exculpatory for Newton. This was supported by the fact that Newton filed a notice of alibi prior to trial asserting that it was impossible for the alleged offenses to have occurred in the "equipment room" as claimed by J.E. because during the relevant time period that room was being used as an art storage room. Newton's notice of alibi noted his intent to present witnesses who would establish that the room did not contain any athletic equipment during that time, in contrast to J.E.'s allegations. Instead, Newton's attorney intended to establish that the room contained artwork and art tables. Page also conceded that J.E. had testified at trial that the softballs were lined up only along the side

of a particular wall but in the video from the second interview J.E. appeared to draw the balls "all over the place." Aside from being inconsistent with J.E.'s trial testimony, such placement of the balls may have been inconsistent with the location of any art tables the defense intended to establish had been in the room. The precise locations of the balls in the second diagram could not be ascertained from the video of the interview.

{¶13} Following the examination of Detective Page, Newton's trial counsel moved to dismiss the charges against him due to the destruction of evidence. The trial court held its ruling on the motion in abeyance until the testimony of J.E. and Detectives Siegel and Page had been completed in order to determine if Newton's counsel could fairly cross-examine the witnesses about the contents of the missing diagram. During her cross-examination, J.E. denied drawing the location of the balls in a manner inconsistent with her prior testimony but conceded that the details of the diagram could not be discerned from the video of her second interview. J.E. admitted that the trial court would just have to take her word for it.

{¶14} After the conclusion of the testimony of J.E. and the two detectives, the trial court revisited Newton's motion to dismiss. After hearing arguments from the parties, the court issued a written decision dismissing the charges against Newton with prejudice. The court found that Detective Page concealed, suppressed or destroyed materially exculpatory evidence in bad faith. The court stated that it had considered lessor sanctions short of dismissal but concluded that "no lesser sanction could ever be appropriate under the facts of this case."

**Law and Analysis**

**I. Was there a Due Process Violation?**

**{¶15}** We review de novo a trial court's decision involving a motion to dismiss on the ground that the state failed to preserve exculpatory evidence. *State v. Blackshaw*, 8th Dist. Cuyahoga No. 85432, 2005-Ohio-5203, ¶ 10. The suppression of materially exculpatory evidence violates a defendant's due process rights, regardless of whether the state acted in good or bad faith. *State v. Geeslin*, 116 Ohio St.3d 252, 2007-Ohio-5239, 878 N.E.2d 1, ¶ 9, citing *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

**{¶16}** We note that both parties cite to case law pertaining to discovery violations under Crim.R. 16. However, the cases cited are inapplicable to a case dealing with the destruction of evidence. *See Bratenahl v. Osredkar*, 8th Dist. Cuyahoga No. 104916, 2017-Ohio-5811, ¶ 15-16. Instead, specific tests are applied to determine whether the state's failure to preserve evidence rises to the level of a due process violation. The test depends on whether the lost or destroyed evidence involves "material exculpatory evidence" or "potentially useful evidence." *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 73.

**{¶17}** To be materially exculpatory, "evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *California v. Trombetta*, 467 U.S. 479, 489, 104 S.Ct. 2528, 81 L.Ed.2d 413

(1984). "Even in the absence of a specific request, the prosecution has a constitutional duty to turn over exculpatory evidence that would raise a reasonable doubt about the defendant's guilt." *Id*. at 485. The defendant bears the burden to show that the evidence was materially exculpatory. *Powell* at ¶ 74, citing *State v. Jackson*, 57 Ohio St.3d 29, 33, 565 N.E.2d 549 (1991).

{¶18} This court has previously held that the possibility that evidentiary material could have exculpated the defendant if preserved or tested is not enough to satisfy the standard of constitutional materiality. *State v. Durham*, 8th Dist. Cuyahoga No. 92681, 2010-Ohio-1416, ¶ 12, citing *Arizona v. Youngblood*, 488 U.S. 51, 56, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). "A clear distinction is drawn by *Youngblood* between materially exculpatory evidence and potentially useful evidence. If the evidence in question is not materially exculpatory, but only potentially useful, the defendant must show bad faith on the part of the state in order to demonstrate a due process violation." *Geeslin,* 116 Ohio St.3d, 2007-Ohio-5239, 878 N.E.2d, at 254. Therefore, when evidence is only potentially useful, its destruction does not violate due process unless the police acted in bad faith when destroying the evidence. *Cleveland v. Townsend*, 8th Dist. Cuyahoga No. 99256, 2013-Ohio-5421, ¶ 22, citing *State v. Miller*, 161 Ohio App.3d 145, 2005-Ohio-2516, 829 N.E.2d 751 (2d Dist.).

{¶19} The term "bad faith" generally implies something more than bad judgment or negligence. It imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive, or ill will partaking of the nature of the

fraud. It also embraces actual intent to mislead or deceive another. *Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, at ¶ 81.

{¶20} In *Durham*, this court examined a situation where an alleged criminal incident was caught on videotape but no one viewed the videotape before it was erased. We noted that the videotape evidence might have been inculpatory or exculpatory or a combination of the two. We held that the defendant was unable to demonstrate that the evidence was materially exculpatory and we treated the erased video as only potentially useful. *Durham* at ¶ 21.

{¶21} In this case, we need not conclude that the exhibit was materially exculpatory to find a due process violation because it is undisputed that the second diagram was potentially useful to the defense and the record contains overwhelming evidence of bad faith on the part of Detective Page in the destruction or concealment of the diagram.

{¶22} Detective Page's bad faith is established by the following undisputed facts: 1) the lost diagram was created during J.E.'s second interview and was left in the possession of Detective Page; 2) unlike the diagram produced in J.E.'s first interview, Detective Page did not file the second diagram as evidence; 3) when Newton's counsel sought discovery of the diagram, Page denied its existence to Detective Siegel and the prosecuting attorney; 4) Page knew the diagram was lost or destroyed at least a week prior to trial but elected to conceal this fact from Detective Siegel and the prosecuting attorney; 5) when confronted with the above facts at trial, Page lied to the trial judge about what she had told the prosecuting attorney. Considering these facts and the previously detailed

inappropriate statements made by Detective Page during the investigation, we agree with the trial court's conclusion that bad faith was established in the record.[1]

**II. Remedy**

{¶23} Finally, the state argues that the trial court abused its discretion in dismissing the charges against Newton as a discovery sanction because the prosecuting attorney was not involved in the willful destruction or loss of the diagram. However, knowledge of evidence on the part of a law enforcement officer is imputed to the prosecution. *State v. Wiles*, 59 Ohio St.3d 71,78, 571 N.E.2d 97 (1991).

{¶24} The state again relies on a line of cases dealing with discovery violations under Crim.R. 16 including *Lakewood v. Papadelis*, 32 Ohio St.3d 1, 511 N.E.2d 1138 (1987); *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971; *State v. Parson*, 6 Ohio St.3d 442, 453 N.E.2d 689 (1983); and *State v. Clark*, 8th Dist. Cuyahoga No. 88731, 2007-Ohio-3777. The state cites *Clark* for the proposition that the actions of Detective Page should not be imputed to the prosecutor for the purpose of finding a willful violation of Crim.R. 16 under the three-part test for determining discovery sanctions set forth in *Parson*.

{¶25} However, as addressed above, this court has distinguished between cases involving discovery violations under Crim.R. 16 and cases dealing with the destruction of evidence in violation of a defendant's constitutional due process rights. *See Osredkar*, 8th Dist. Cuyahoga No. 104916, 2017-Ohio-5811, at ¶ 15-16. We specifically held that the

---

[1]We note that the trial court went to great lengths to exonerate the prosecuting attorney of any

three factor test from *Parson* is inapplicable where, as here, the information sought by the defense no longer exists because it has been destroyed. *Id*. This is not a case where the state suppressed exculpatory evidence that was discovered after the defendant's conviction and said evidence can be appropriately considered at a new trial. *See, e.g. State v. Russell*, 8th Dist. Cuyahoga No. 94345, 2011-Ohio-592.

{¶26} The United States Supreme Court described the process of reaching an appropriate remedy in cases involving the destruction of evidence as follows:

> Whenever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed. * * * Moreover, fashioning remedies for the illegal destruction of evidence can pose troubling choices. In nondisclosure cases, a court can grant the defendant a new trial at which the previously suppressed evidence may be introduced. But when evidence has been destroyed in violation of the Constitution, the court must choose between barring further prosecution or suppressing * * * the State's most probative evidence.

*Trombetta*, 467 U.S. at 486-487, 104 S.Ct. 2528, 81 L.Ed.2d 413.

{¶27} Following *Trombetta*, federal courts have held that dismissal is appropriate where the disposition of evidence that is central to the case has permanently deprived the defendant of due process. *United States v. Pasha*, 797 F.3d 1122, 1138 (D.C.Cir.2015), citing *United States v. Bohl*, 25 F.3d 904, 914 (10th Cir.1994). We find that the loss or destruction of the second diagram in this case permanently deprived Newton of his ability to challenge J.E.'s account of the alleged incident and, therefore, permanently deprived him of due process.

wrongdoing in relation to Detective Page's conduct and deceit.

**{¶28}** Our conclusion that dismissal was appropriate in this instance would not be changed even if we applied the Crim.R. 16 discovery sanction rule from *Papadelis*, 32 Ohio St.3d 1, 511 N.E.2d 1138, that "a trial court must inquire into the circumstances surrounding a discovery rule violation and, when deciding whether to impose a sanction, must impose the least severe sanction that is consistent with the purpose of the rules of discovery." *Id.* at paragraph two of the syllabus. The state has failed to proffer a reasonable alternative sanction short of dismissal. The record reflects that Detective Page lost or destroyed potentially exculpatory evidence that could have contradicted J.E.'s trial testimony and, in attempting to conceal this fact, went so far as to lie to another detective, the prosecuting attorney and the trial court about the circumstances of its disappearance. We cannot say that the trial court abused its discretion in electing to dismiss the case as a result of this misconduct and the depravation of Newton's due process rights.

**{¶29}** The judgment of the trial court is affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, ADMINISTRATIVE JUDGE

TIM McCORMACK, J., CONCURS and
FRANK D. CELEBREZZE, JR., J., CONCURS IN JUDGMENT ONLY